IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MICHAEL LORENZO PETERSON,
   Plaintiff,

vs.           Case No. 5:12cv107/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]
   Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

   This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 10, 11).  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

   Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence.  The decision of the Commissioner is therefore affirmed.

I.  PROCEDURAL HISTORY

   On September 17, 2008, Plaintiff applied for SSI benefits alleging disability beginning October 5, 2005 (tr. 17; 122–25; 134).[2] His application was denied initially and on reconsideration.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Fed. R. Civ. P. 25(d), she is therefore automatically substituted for Michael J. Astrue as the Defendant in this case.

[2] All references to "tr." refer to the transcript of Social Security Administration record filed on July 11, 2012 (doc. 8). Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

Plaintiff thereafter requested a hearing before an administrative law judge ("ALJ"), who conducted a hearing on July 1, 2010. Plaintiff was represented by counsel at the hearing, and Plaintiff and a vocational expert ("VE") testified. On July 28, 2010, the ALJ issued a decision denying Plaintiff's claim (tr. 17–26). The Appeals Council subsequently denied Plaintiff's request for review (*see* tr. 1). Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

II.    FINDINGS OF THE ALJ

In his July 28, 2010, decision the ALJ made the following findings:

1)    Plaintiff has not engaged in substantial gainful activity since September 17, 2008, the date he filed his SSI application.[3]

2)    Plaintiff has the following severe impairments: disorder of the spine, including status post alleged work injury and mild degenerative disc disease. Plaintiff's alleged depression is not a severe impairment.

3)    Plaintiff has no impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4)    Plaintiff has the residual functional capacity ("RFC") to perform light work, with certain physical limitations.[4]

5)    Plaintiff is unable to perform any past relevant work.

6)    Plaintiff was born on November 17, 1981. On the date he filed his SSI application Plaintiff was twenty-six years of age, which is defined as a younger individual.

---

[3] Thus the time frame relevant to Plaintiff's claim for SSI is September 17, 2008 (date he applied for SSI) through July 28, 2010 (date of ALJ's decision). *See* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which he is both disabled and has an SSI application on file). Accordingly, the general time frame relevant to this appeal is approximately September 2008 through July 2010.

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b). Additionally, Plaintiff is precluded from climbing ladders, ropes, or scaffolding. Plaintiff can occasionally climb ramps and/or stairs, as well as occasionally balance, stoop, kneel, crouch, and crawl. Plaintiff must avoid concentrated exposure to hazards.

7)     Plaintiff has a limited education and is able to communicate in English.

8)     The Medical-Vocational Rules, used as a framework for decisionmaking, support a finding that Plaintiff is "not disabled."  Thus, regardless of whether Plaintiff has transferable job skills, transferability of job skills is not material to the disability determination.

9)     In light of Plaintiff's age, education, work experience, and RFC, and based on the testimony of the VE, jobs exist in significant numbers in the national economy that Plaintiff can perform.  These include assembler of small products; mail sorter; and ticket seller.

10)    Plaintiff has not been under a disability, as defined in the Social Security Act, from September 17, 2008, through the date of the decision.

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence.  42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520,

1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[5] the Commissioner analyzes a disability claim in five steps:

1.    If the claimant is performing substantial gainful activity, he is not disabled.

2.    If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.    If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.    If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.    Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

---

[5] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits ("DIB") or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, hereinafter, citations in this Order should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PERSONAL HISTORY/HEARING TESTIMONY and MEDICAL HISTORY[6]

A.      Personal History/Hearing Testimony

At the July 1, 2010, administrative hearing Plaintiff stated that he has an eleventh grade education and lives with his mother (tr. 35). When asked if he has any emotional or mental problems that would keep him from working, Plaintiff stated that he "get[s] depressed" but acknowledged that he has received no treatment for this condition (tr. 42). Plaintiff reported that he suffered a work-related injury in October 2005 and was awarded workers' compensation benefits in 2006 (tr. 39; 285). In a Disability Report from September 2008 Plaintiff claimed he was unable to work due to problems with his back, left leg, and shoulder blade (tr. 139). He had attempted to work after his disability onset in October 2005 as a car detailer and a dishwasher but he only performed these jobs briefly (tr. 35–36). Prior to October 2005 he also worked as a cook and a laborer in shipyards and construction; he also worked very briefly as an automobile mechanic and amusement park attendant (tr. 36–37).

Plaintiff testified that he is "always in pain" (tr. 37–38). His lower back feels as if his "spine is crunching," and between his shoulder blades it feels as if he is being pinched (tr. 38). His left leg "goes numb" and it "[f]eels like nails on the bottom of [his] foot" (*id.*). To relieve pain, Plaintiff takes Flexeril and Lortab and has been given steroid injections (tr. 40–41). He uses a cane to ambulate "[a]ll of the time" (tr. 44), though he acknowledged the cane was not prescribed by a physician (tr. 38). In a Supplemental Pain Questionnaire from October 2008, Plaintiff reported that, other than microwaveable products, someone else cooks his meals (tr. 160). He is unable to sit more

---

[6] The information in this section is primarily derived from the opinion of ALJ but is supplemented with references to the record made by Plaintiff and the Commissioner in their memoranda.

Case No.: 5:12cv107/EMT

than forty-five minutes in one place or stand more than thirty-five minutes (*id.*).  He is unable to do any housecleaning, laundry, home maintenance, or yard work but can do "light" shopping and drive "short distances" (*id.*).  At the administrative hearing Plaintiff reiterated that he performs no household chores; rather, his mother "does everything" (tr. 42).

According to Plaintiff, he is able to lift and/or carry less than three to four pounds; he estimated that, with his cane, he can stand and walk for thirty to thirty-five minutes and sit twenty-five minutes but he cannot stand for any length of time without the cane (tr. 41–42).  Plaintiff stated that his condition has gotten worse since his 2005 injury (tr. 43).  On a scale of 1–10, with "1" being minimal pain and "10" being "the worst pain imaginable," Plaintiff rated his constant back pain at "8" (*id.*).  He also reported that pain medications, which make him "drowsy and weak," only "ease" the pain for a "little bit"; even when he takes his medication his pain is still an "8" (tr. 44).  Plaintiff spends most days lying down, "constantly moving" and shifting about in an effort to find a position that reduces his pain (tr. 45).

The VE testified that Plaintiff has past relevant work as a fry cook, construction laborer, and automobile detailer (tr. 46–47).  The ALJ asked the VE to assume an individual of Plaintiff's age, education, and work experience who was precluded from climbing ladders, ropes, or scaffolding (tr. 47, 48).  The individual could only occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch, and crawl (tr. 47).  The individual must avoid concentrated exposure to hazards (*id.*).  The VE testified that such an individual could not perform any of Plaintiff's past work (*id.*).  There was other work in the national economy, however, that the individual could perform.  These positions included assembler of small products, mail sorter, and ticket seller (tr. 48).  In the second hypothetical question, the ALJ asked the VE to assume that Plaintiff's hearing testimony concerning his functional capabilities was credible and that Plaintiff could not work at any exertional level consistently due to pain (tr. 48–49).  The VE testified that Plaintiff could not perform his past work.  Also, the VE testified, a hypothetical person of Plaintiff's age, education, and work experience with such limitations could not perform any other work in the national economy (tr. 49).

B.    Relevant Medical History

As previously noted, the time frame relevant to this appeal is September 17, 2008, through July 28, 2010. Many of the treatment records, however—including records from physician Bill Bautsch, M.D., on which Plaintiff relies heavily—are not from within the pertinent period. Accordingly, in order to assess the ALJ's decision, the court has included in its review evidence that is dated well prior to the relevant time frame.

Plaintiff first saw Dr. Bautsch at the Bay Walk-In Clinic on October 10, 2005, after Plaintiff had been injured on the job lifting heavy construction materials (tr. 232). Upon examination, Dr. Bautsch noted no radicular symptoms (*id.*). Dr. Bautsch's impression was lumbar spine muscle spasm, for which he wrote several prescriptions and advised a follow up visit in one week (*id.*). Plaintiff returned to the Clinic on October 16, and was advised to use warm moist heat for his injury and to take his medications as directed (tr. 213). Plaintiff received similar instructions on a return visit to the Clinic on October 18, 2005; it was further noted that he was restricted to light duty (tr. 212). An x-ray of the lumbar spine taken October 18, 2005, revealed intact vertebral bodies, and normal alignment, disc spaces, and pars interarticularis (tr. 226). The impression was "unremarkable" (*id.*). On a "Florida Workers' Compensation Uniform Medical Treatment/Status Reporting Form" dated October 18, 2005 (doc. 214–15), Dr. Bautsch checked the box indicating that Plaintiff could return to work, provided he observed certain restrictions, which included not lifting more than twenty pounds (tr. 214). The next day, October 19, 2005, Plaintiff returned to the Clinic complaining of pain in the shoulder blade and lower left back, with numbness down the left leg and pain into the bottom of his left foot (tr. 225). Dr. Bautsch's diagnosis was lumbar spine muscle spasm with radiculopathy (*id.*). He ordered magnetic resonance imaging ("MRI") of the lower spine, and he advised a return visit after the MRI was obtained and the previously written prescriptions—which Plaintiff had not yet obtained—were filled (*id.*; *see also* tr. 224). In the "Physician Plan" section of his report Dr. Bautsch wrote "no work"(tr. 225). Dr. Bautsch completed a new "Florida Workers' Compensation Uniform Medical Treatment/Status Reporting Form" on October 19, 2005 (tr. 234–35), in which he checked a box indicating that Plaintiff's functional limitations and restrictions were so severe that Plaintiff could not perform even sedentary work at that time (tr. 235). Plaintiff returned to the Clinic on October 26, 2005, and complained of continued severe pain (tr. 223). Dr. Bautsch's impression was severe lower spine muscle spasm, for which he recommended medications (*id.*). Dr. Bautsch completed another "Florida Workers' Compensation

Uniform Medical Treatment/Status Reporting Form" on October 26, 2005 (tr. 217–18), in which he indicated Plaintiff could return to work provided he adhered to the functional limitations and restrictions identified "before"; Dr. Bautsch also noted that the maximum medical improvement ("MMI") date could not be determined at that time (tr. 218).

An MRI was obtained on October 29, 2005 (tr. 222). It revealed mild degeneration and small posterocentral disc herniation that was causing very mild deformity of the thecal sac, without apparent asymmetry. There was minor posterior and posterolateral bulging of the discs at L3–4 and L4–5, quite possibly physiological (or "normal for this patient"), but the left foramina appeared very slightly more narrowed than on the right. Very subtle crowding of the L3 and L4 nerve roots may exist. The age of the injury could not be estimated (*id.*).

Plaintiff returned to the Bay Walk-In Clinic for the sixth time on November 1, 2005, with complaints of worsening lower back pain (tr. 230). Dr. Bautsch's impression was lumbar spine disc disease with radiculopathy, for which he continued treatment with medications (*id.*). The same date, November 1, 2005, Dr. Bautsch filled out another "Florida Workers' Compensation Uniform Medical Treatment/Status Reporting Form" for Plaintiff (tr. 219–20). On this Form Dr. Bautsch checked the box which indicated that Plaintiff could not perform even sedentary work; he also indicated that Plaintiff's anticipated MMI could not be determined at that time (tr. 220).

The record appears to contain no evidence of any additional treatment Plaintiff received for his October 2005 injury until May 17, 2006, when he presented to a physical therapist for an initial evaluation (tr. 237–39). Plaintiff was assessed with "functional limitations for all physical activities relating to self care and daily living" (tr. 238). The assessment further noted that Plaintiff had a diagnosis of "possible bulging lumbar disc. He presented with abnormal gait and posture, marked tenderness to palpation, decreased mobility and strength of the lumbar spine. Sitting root test was positive for sciatic nerve irritation. Extreme pain behavior was demonstrated by the patient, making his rehabilitation potential [p]oor" (tr. 238–39). A Weekly Patient Progress Summary from May 26, 2006, notes that Plaintiff "refuses to make appts. because of 'transportation probls'" and had not returned telephone calls (tr. 245). A similar Summary, dated June 8, 2006, reflects that Plaintiff had made no progress. He had not demonstrated compliance with the home exercise program and was "making little effort to comply with therapeutic process" (tr. 242). The therapist opined that Plaintiff

displayed "[m]ajor symptom exaggeration" and should be discharged from the treatment program (*id.*). In the Discharge Summary, it was again stated that Plaintiff had been non-compliant with visits and the home exercise program; it was further noted that Plaintiff had "[s]ymptom exaggeration" and "poor motivation" (tr. 241).

The next record of medical care received by Plaintiff is dated December 13, 2008, or some two and one-half years after his discharge from physical therapy. On this date Plaintiff presented to the emergency room of Bay Medical Center with the chief complaint of back pain since 2005 (tr. 264). Plaintiff reported no paresthesias in or pain radiating to the arms or legs (*id.*). Physical examination was largely unremarkable, with some minor pain of the musculature of the back (*id.*). There was no edema or spasm, reflexes were 2+, and straight leg raising tests were negative bilaterally (*id.*). Plaintiff was diagnosed with chronic low back pain, referred to another physician, and given medication (*id.*).

Approximately seven months later, in July 2009, Plaintiff returned to the Bay Medical Center Emergency Room (tr. 285). Plaintiff's chief complaint again was back pain, with a reported onset of two days prior. Plaintiff reported that his back had been injured in 2005 and that an MRI had revealed herniated discs at L3-4 and L4-5 (*id.*). Physical examination revealed decreased ROM, tenderness, and muscle spasm, but straight leg raising tests were negative, there were no motor or sensory deficits, and reflexes were normal (*id.*). Between September 2009 and May 2010 Plaintiff returned to the Bay Medical Center Emergency Room four times complaining of back pain (tr. 282–83; 297–306; 307–14; 324–33). In September 2009 Plaintiff was diagnosed with chronic back pain and back spasms (tr. 283). Physical examination revealed decreased ROM, tenderness, and muscle spasm, but straight leg raising tests were negative, there were no motor or sensory deficits, and reflexes were normal (tr. 282). Plaintiff also presented to the emergency room in October 2009 for a severe nosebleed; the record discloses no complaint of back pain at that time (tr. 316–22). In November 2009 Plaintiff returned to the Bay Medical Center Emergency Room with the chief complaint of back pain (tr. 308). He reported that he had been referred for a neurosurgery consultation but he had no health insurance and without insurance he could not obtain an appointment (tr. 309). Plaintiff reported the onset of sharp low back pain the previous evening (*id.*). It was noted that Plaintiff limped to the room (tr. 310), and examination revealed decreased range

of motion and muscle spasm (tr. 312). Straight leg raising tests were negative bilaterally, and Plaintiff was found to be neurologically intact with normal motor, sensation, and reflexes (*id.*).

In January 2010 Plaintiff reported back pain that radiated to his left leg and caused numbness (tr. 298). Physical examination showed decreased range of motion, muscle spasm, and vertebral point tenderness (tr. 302). Straight leg raising tests were positive at 10 degrees (*id.*). Motor responses, sensation, and reflexes were unremarkable (*id.*). Radiographs taken in January 2010 showed that alignment was satisfactory, vertebral body height and disc spaces were maintained, pedicles were intact, and no fracture or subluxation was identified (tr. 306). The evaluator's opinion of Plaintiff's back was "no acute abnormality" (*id.*). Plaintiff returned to Bay Medical Center Emergency Room in May 2010, when he again complained of back pain (tr. 326). With respect to his medical history, Plaintiff reported that an MRI had shown a ruptured disc at L4-5; additionally, Plaintiff reported feeling a needle sensation in the bottom of his left foot, as well as left shoulder pain (tr. 329). Range of motion was decreased, muscle spasm was observed, and there was some tenderness of the vertebral point (tr. 328). Straight leg raising test was negative on the right and positive on the left at twenty degrees (*id.*). Reflexes were normal but sensory and motor deficits were noted (*id.*). The impression was chronic lower back pain with acute sciatica in the left leg (*id.*).

Other Relevant Evidence

In January 2009, state agency physician John Dawson, M.D., reviewed the medical evidence and prepared a Physical Residual Functional Capacity Assessment of Plaintiff (tr. 271–78). Dr. Dawson concluded that Plaintiff had degenerative disc disease but retained the ability to perform a full range of light work. In support of his opinion, Dr. Dawson cited the October 2005 MRI of the lumbar spine, which had revealed only mild degeneration and small disc herniation at L5-S1 and minor disc bulging at L3-4 and L4-5; the unremarkable October 2005 x-ray; the largely unremarkable physical findings at the December 13, 2008, emergency room examination; and Plaintiff's acknowledgment that he could ambulate without an assistive device (tr. 272).

V.    DISCUSSION

Plaintiff raises one issue in this appeal: the ALJ erred in rejecting the disability opinion of Dr. Bautsch, his treating physician in October/November 2005 (doc. 11 at 6–11). In so arguing, Plaintiff submits that the October 2005 MRI, the January 2010 x-ray, and Dr. Dawson's assessment

do not provide good cause for rejecting Dr. Bautsch's opinion (doc. 11 at 8–9). Plaintiff also contends that the ALJ should have recontacted Dr. Bautsch for additional information or clarification concerning Plaintiff's impairment.

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis v. Callahan, 125 F.3d 1436, 1439-1441 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Chater, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). Thus, an ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. But, if an ALJ elects "to disregard the opinion of a treating physician, the ALJ must clearly articulate [his] reasons" for doing so. *Id.* at 1241; *see also* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

Where substantial record evidence supports the ALJ's decision to discount a treating physician's opinion, the opinion of an examining physician itself becomes entitled to significant weight. *See* Richardson v. Perales, 402 U.S. 389, 91 (1971) (report of consultative examiner may constitute substantial evidence supportive of a finding adverse to a claimant); 20 C.F.R. § 404.1527 (every medical opinion should be evaluated, and unless a treating source's opinion is given controlling weight, the following factors are considered in deciding the weight to be given to any medical opinion: examining versus non-examining; treatment relationship, including length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship; supportability of the opinion(s); consistency with the record as a whole; specialization; and "other factors").

As an initial matter, the court notes that under the controlling regulations the final responsibility for deciding the ultimate issue of whether a social security claimant is "disabled" or "unable to work" is reserved to the Commissioner.  20 C.F.R. § 416.927(e)(1) (internal quotation marks omitted).  Consequently, an ALJ is not bound by a treating physician's opinion on the ultimate issue of disability, *id.*, and such an opinion is never entitled to controlling weight or special significance.  *See* Social Security Ruling 96–5p, 1996 WL 374183 (July 2, 1996).  To require the Commissioner to accept as controlling a statement that a claimant is or is not disabled—or is or is not capable of work at a particular level of exertion—would require the Commissioner to credit the physician not only with knowledge of the claimant's physical condition, but also with an understanding of the nuances of how the regulations analyze physical limitations with respect to job experience, age, education, transferability of skills, the definitions of the various levels of exertion relevant to types of work, and similar matters.  In short, a physician's opinion that a claimant cannot work or is disabled is not a conclusive medical opinion for the purpose of Social Security benefits determinations and by itself is not entitled to special significance.  Opinions from any medical source on issues reserved to the Commissioner may not, however, be ignored.  Rather, the ALJ must evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner to determine the extent to which the opinion is supported by the record.  In the instant case, the ALJ did so, and the court concludes his findings concerning the opinions of Dr. Bautsch and Dr. Dawson are supported by substantial evidence.

The ALJ did not mention Dr. Bautsch or his disability finding by name or date, but the ALJ did take note of the fact that in 2005 Plaintiff had been restricted from performing even sedentary work (tr. 22), the finding Dr. Bautsch made on the November 1, 2005, workers' compensation form.  Dr. Bautsch further indicated on the form that Plaintiff's anticipated MMI date could not be determined at that time (tr. 220).  Thus, although Dr. Bautsch had the opportunity to opine that Plaintiff had reached MMI and give a date on which that improvement had been achieved—which would suggest that the level of impairment he found was permanent—Dr. Bautsch did not do so.  Rather, as seems consistent with an opinion given only weeks after an on-the-job lifting injury of the type Plaintiff sustained, Dr. Bautsch left open the possibility that Plaintiff's condition would

improve. In the court's view, Dr. Bautsch's final assessment—rendered not long after Plaintiff's injury in October 2005 and in connection with a workers' compensation claim—should not be read as opining that, on a permanent basis, Plaintiff was restricted from performing even sedentary work. Moreover, Dr. Bautsch's assessment was made on a preprinted form; as such, it does not provide persuasive evidence of the validity of the opinions expressed therein. *See, e.g.*, Hammersley v. Astrue, No. 5:08cv245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions.") (citing Spencer ex rel. Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985) (rejecting opinion from a non-examining physician who merely checked boxes on a form without providing any explanation for his conclusions); Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (noting that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.")). Stated another way, opinions on such forms are merely conclusory, and it is entirely proper for an ALJ to reject a treating physician's opinion on such a basis.

Next, the record contains only three reports of objective diagnostic studies performed on Plaintiff over a period of more than four years, none of which reports remotely supports a finding that Plaintiff was unable to perform even sedentary work during the relevant period of September 17, 2008, through July 28, 2010. The October 18, 2005, x-ray revealed "unremarkable" findings (tr. 226). Also, the October 29, 2005, MRI revealed only mild degeneration and a small posterocentral disc herniation causing very mild deformity of the thecal sac (tr. 222). There was posterior and posterolateral bulging of the discs at L3–4 and L4–5, but it was minor and possibly normal for Plaintiff; also, while there may have been very subtle crowding of the L3 and L4 nerve roots, that finding was not definitive (*id.*). An opinion of total disability, that is, the inability to perform even sedentary work, is not consistent with the relatively minor findings in the October 18, 2005, x-ray and the October 29, 2005, MRI, both of which studies were ordered by and available to Dr. Bautsch. Moreover, Dr. Bautsch's clinical reports provide little in the way of objective findings and thus are not supportive of an opinion of total disability (*see, e.g.,* tr. 212; 213; 223; 225; 230; 232). In sum, the court finds that the October 2005 radiological studies constitute good cause for discounting the opinion that Plaintiff was unable to perform even sedentary work.

The January 2010 x-ray—which revealed no acute abnormalities—was taken more than four years after Plaintiff's October 2005 injury and four years after Dr. Bautsch rendered his opinion, and it is the only radiological evidence obtained during the relevant period (tr. 306). Plaintiff contends, however, that this x-ray cannot constitute good cause for rejecting Dr. Bautsch's opinion in light of the clinical notes from January 2010 and May 2010 that suggest Plaintiff's impairment was of the same severity it had been in 2005 when he first injured his back (doc. 11 at 9). As the ALJ noted, in general the medical evidence is "scant" and that which is available is "dominated by [Plaintiff's] subjective complaints, which are poorly supported by any objective findings" (tr. 22). Moreover, the ALJ noted, the record reflects that Plaintiff sought treatment only sporadically for his back pain and that there were significant gaps in his treatment history (id.). Indeed, the record reflects that after his back was initially injured and he received medical attention in October/November 2005, Plaintiff sought no medical care for about six months, or until May 2006, when he was assessed for physical therapy. The following month he was discharged from physical therapy for lack of compliance with the program and poor motivation; it was also noted that Plaintiff exhibited "[s]ymptom exaggeration" (tr. 241). After Plaintiff was discharged from physical therapy in June 2006, the record reflects that he went two and one-half years—or until December 2008—without seeking medical care, and when he did seek care the physical examination was largely unremarkable (tr. 264). Approximately seven months later, in July 2009, Plaintiff again sought treatment for back pain. Although Plaintiff reported that his pain was related to a 2005 back injury, he indicated that the onset of his current acute symptoms was just two days prior (tr. 285). Furthermore, other than decreased range of motion, tenderness, and muscle spasm, physical examination revealed few positive findings (id.). Similar findings were reported for Plaintiff's September 2009 visit to the emergency room (tr. 282). Plaintiff made no complaint of back pain at all in October 2009 when he presented to the Bay Medical Center Emergency Room for a severe nosebleed (tr. 316–22). When Plaintiff returned to the emergency room in November 2009, he reported that sharp pain in his lower back had started the previous night; however, other than decreased range of motion and muscle spasm, there were no positive physical findings (tr. 312). Although the record does reflect increased physical findings at both the January 2010 visit and the May 2010 visit, the more significant findings in these two isolated reports are not representative of the entire record, and there

is no evidence that Plaintiff sought, required, or received treatment for back pain in the four-month interval between the two examinations (tr. 302; 328). The record as a whole simply does not, as Plaintiff seems to argue, support a finding that the severity of Plaintiff's back condition remained consistent from October 2005, when Dr. Bautsch found that Plaintiff could not perform even sedentary labor, through May 2010. The January/May 2010 clinical notes do not provide support for discounting the minimal physical findings described in the January 2010 x-ray report, which are very similar to those made in the October 2005 x-ray report: both x-rays essentially revealed nothing remarkable (*see* tr. 226; 306). In short, the medical evidence, when considered as a whole, reflects that although Plaintiff periodically experienced back pain commencing in October 2005 after his back was injured, the instances were limited, irregular, and inconsistent in the severity of symptoms exhibited.[7] The court therefore concludes that the January 2010 x-ray study which reported no remarkable findings constitutes additional good cause for discounting Dr. Bautsch's November 2005 opinion that Plaintiff was unable to perform even sedentary work.

Plaintiff also contends that the Physical Residual Functional Capacity Assessment prepared by Dr. Dawson does not constitute good cause for discounting Dr. Bautsch's disability opinion. The ALJ is required to consider the opinions of non-examining state agency medical consultants, such as Dr. Dawson, because they "are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 416.927(f)(2)(I). Unless good cause is found, however, a non-examining physician's opinion is entitled to little weight if it is contrary to the treating or examining physician's findings. *See* Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988); Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985). *See also* Ogranaja v. Commissioner of Social Sec., 186 F. App'x 848, 850–51 (11th Cir. 2006) (ALJ may assign greater weight to the opinions of non-examining physicians that are contrary to the opinions of a treating physician, provided the ALJ properly discounts the treating physician's opinion and the opinions of the non-examining physicians are well supported and consistent with the record as a whole).

---

[7] The court notes Plaintiff's references to the record showing that he had a ruptured spinal disc (doc. 11 at 5; 9). To the court's knowledge, the record merely reflects Plaintiff's subjective *report* of having suffered a ruptured disc (tr. 329). The court is aware of no objective evidence in the record that shows Plaintiff underwent an MRI that revealed any ruptured discs.

As discussed above, even without Dr. Dawson's assessment, good cause exists for rejecting Dr. Bautsch's opinion of total disability. Moreover, in assigning great weight to Dr. Dawson's opinion, as the record outlined above reflects, the ALJ properly found that it was "supported by the medical signs and/or findings and consistent with other medical evidence of record . . . ." (tr. 23). Thus the court finds no error in the ALJ's refusal to credit Dr. Bautsch's opinion of total disability or his reliance on Dr. Dawson's opinion to determine that Plaintiff retained the RFC to perform a limited range of light work.[8] *See* <u>Wainwright v. Comm'r of Soc. Sec. Admin.</u>, No. 06–15638, 2007 WL 708971, at *2 (11th Cir. Mar, 9, 2007) (unpublished opinion) (where ALJ properly rejected examining psychologist's opinion, ALJ was entitled to rely on the opinions of non-examining state agency psychologists); <u>Peterson v. Astrue</u>, No. 08-1043, 2009 WL 1922239, at *6 (M.D. Fla. July 2, 2009) ("Because the ALJ properly discredited Dr. Borge's opinion, he did not err in giving increased weight to the opinions of the non-examining consultants.").

Finally, Plaintiff argues that, as a matter of "fairness," the ALJ should have recontacted Dr. Bautsch for additional information or clarification of his opinion as it was the only opinion offered by a treating or examining physician (doc. 11 at 10). "[A] hearing before an ALJ is not an adversarial proceeding" and "the ALJ has a basic obligation to develop a full and fair record." <u>Graham v. Apfel</u>, 129 F.3d 1420, 1422 (11th Cir. 1997). Accordingly, the ALJ must probe into all relevant facts, even where a claimant is represented by counsel. <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981). The ALJ is not required to recontact a treating source, however, when the ALJ rejects the source's opinion because it is unsupported by or inconsistent with the record. *See* 20 C.F.R. § 416.927 (providing an opinion unsupported by or inconsistent with the evidence is entitled to little or no weight). Development of the record by recontacting a treating source is necessary only where the record is insufficient for the ALJ to make a determination about whether an individual is disabled or not. *See* 20 C.F.R. §§ 416.912(e) and 416.927(c)(3) (effective prior to Mar. 26, 2012) (stating that an ALJ needs to recontact a medical source only where the ALJ finds that the available evidence is insufficient to make a disability determination). In determining whether remand is

---

[8] Dr. Dawson in fact concluded that Plaintiff could perform a full range of light work. The ALJ declined to completely accept this conclusion. Instead, "giving [Plaintiff] the benefit of doubt," the ALJ determined that Plaintiff could perform only a limited range of light work (tr. 23).

appropriate, courts should be guided "by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." <u>Brown v. Shalala</u>, 44 F.3d 931, 935 (11th Cir.1995) (quotations omitted). The likelihood of unfair prejudice may arise if there is an evidentiary gap that "the claimant contends supports her allegations of disability." *Id.* at 936 n.9.

In this case, the court concludes that, although the medical evidence was sparse, it was sufficient for the ALJ to decide the case. Dr. Bautsch's records, the physical therapy records, the radiological reports, and the emergency room records document Plaintiff's back injury; these records span the periods both before and after the date Plaintiff alleges disability. The ALJ also had evidence from Dr. Dawson, the non-examining agency expert, and testimony from the VE on which he was entitled to rely. The record was sufficient to make a decision, and the ALJ had no need or duty to recontact Dr. Bautsch—a physician who apparently had no treating relationship with Plaintiff since 2005—merely because he decided to reject Dr. Bautsch's opinion. In light of the substantial evidence in the record, the ALJ had the necessary information to determine Plaintiff's impairments, RFC, and ability to work. Moreover, Plaintiff has not shown that he suffered prejudice as a result of any failure of the ALJ to perform further factfinding. There is no allegation or evidence the ALJ's decision would have changed in light of any additional information. Consequently, the ALJ did not err by failing to recontact Dr. Bautsch.

VI.    CONCLUSION

Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists. The Commissioner's decision is supported by substantial evidence on the record as a whole and should not be disturbed, 42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at1560.

Accordingly, it is **ORDERED**:

1.      The record shall reflect that Carolyn W. Colvin is substituted for Michael J. Astrue as Defendant in this action.

2.      The decision of the Commissioner is **AFFIRMED** and this action is **DISMISSED**.

3.      The clerk is directed to **CLOSE** the file.

At Pensacola, Florida this <u>31</u><sup>st</sup> day of July 2013.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**